**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| K. D., a minor, | : | Case No. 1:10-cv-654 |
| Plaintiff, | : | |
| v. | : | **MEMORANDUM DECISION AND ORDER** |
| Commissioner of Social Security, | : | |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claim for Supplemental Security Income (SSI) under Title XVI of the Act. Pending are the parties' Briefs on the Merits (Docket Nos. 10 & 15). For the reasons that follow, the Commissioner's decision is affirmed.

**I. PROCEDURAL BACKGROUND.**

On July 1, 2005, Plaintiff, through her mother, Karen Jordan, filed an application for SSI alleging that her disability began on January 12, 2004 (Docket No. 8, Exhibit 7, pp. 2-4 of 4). Plaintiff's request was denied initially and upon reconsideration (Docket No. 8, Exhibit 5, pp. 2-4, 7-9 of 34). Plaintiff filed a timely request for hearing and on June 10, 2008, Administrative Law Judge (ALJ) L. Zane Gill

held a hearing at which Plaintiff, represented by counsel, Lawrence Downey, a witness and Karen Jordan, an observer, appeared and testified (Docket No. 8, Exhibit 3, p. 2 of 24). On June 24, 2008, the ALJ rendered an unfavorable decision denying an application for a period of SSI (Docket No. 8, Exhibit 2, p. 12-23 of 23). On January 26, 2010, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner (Docket No. 8, Exhibit 2, p. 2-4 of 23). Plaintiff filed a timely complaint in this Court seeking judicial review (Docket No. 1).

## II. FACTUAL BACKGROUND.

**A.  COUNSEL'S SUMMARY**

By way of background, Plaintiff's counsel provided a narrative of Plaintiff's demographic data and social, psychological and behavioral deficiencies. This summary was supplemented by the testimony of Plaintiff's parents.

Plaintiff, a minor, lived with her mother who was also disabled with a bilateral hearing loss and speech problems. Her father resided in close proximity and he spent unlimited time with his child. Both parents were well aware that Plaintiff had several behavioral problems including hyperactivity (Docket No. 8, Exhibit 3, p. 8 of 24). In her early childhood, Plaintiff spent about two years with her great-grandmother until Plaintiff became overly active. She had been recently placed in the Head Start program to promote cognitive development (Docket No. 8, Exhibit 3, pp. 12-13 of 24).

Plaintiff had a history of ear infections; however, the hearing tests were negative for any problem. Plaintiff lacked behavior control. She had a history of behavior problems characterized by symptoms of hyperactivity, disruptiveness, impulsiveness, disobedience and lack of attention. Plaintiff was easily distracted, engaged in frequent temper tantrums, was generally uncooperative and uncontrollable, sustained a short attention span, and exhibited aggressive behavior. Her global

assessment of functioning (GAF) score of 55 or the numeric scale used to subjectively rate social, occupational and psychological functioning, placed Plaintiff within the range of moderate symptoms or denoted moderate difficulty in social, occupational, or school functioning. Plaintiff's counsel contended, however, that her symptom severity was 50 indicating serious difficulty in behavior and social skills (Docket No. 8, Exhibit 3, p. 9 of 24).

Plaintiff's counsel concluded that the limitations in the areas of behavior control, social skills, attention and concentration were of marked severity (Docket No. 8, Exhibit 3, pp. 10-11 of 24). Based on the record, Plaintiff's counsel determined that Plaintiff met or equaled the limitations in 112.11 of the Listing of Impairments found in 20 C.F.R. § 404, Subpart P, Appendix 1 (Docket No. 8, Exhibit 3, p. 11 of 24).

B. **PLAINTIFF'S TESTIMONY**

At the time of hearing, Plaintiff testified that she was four years of age. She knew that her birthday was on July 12, 2003. She acknowledged that she was in kindergarten and could recite the names of her four teachers (Docket No. 8, Exhibit 3, p. 8 of 24).

C. **KAREN JORDAN'S TESTIMONY.**

Plaintiff's mother did not permit Plaintiff to engage in social activities as it always resulted in an expression of aggressive behavior or adverse feelings about the playmate (Docket No. 8, Exhibit 3, p. 11-12 of 24). During one instance of aggression, Plaintiff ripped up the comforter on her bed (Docket No. 8, Exhibit 3, p. 12 of 24).

Plaintiff's mother recounted instances in which Plaintiff ate and did not put the leftover food in the garbage can. Instead, she hid the food under the bed or behind the couch. Plaintiff's mother described her as moody, often talking back or refusing to talk (Docket No. 8, Exhibit 3, p. 15 of 24).

  **D.**  **LAWRENCE DOWNEY'S TESTIMONY.**

  Plaintiff's father recalled that during her infancy and early childhood, Plaintiff tended to whine. She had graduated to such disruptive behaviors as refusing to clean her room, throwing temper tantrums until her needs were met, breaking or destroying her toys, tearing up her bed and writing on the walls. When punished for failing to follow her father's directives, Plaintiff's poor behavior escalated (Docket No. 8, Exhibit 3, pp. 12-13, 16-17 of 24).

  Plaintiff's father affirmed that his grandmother cared for Plaintiff for two years until Plaintiff's behavior became uncontrollable. At Head Start, Plaintiff often engaged in fighting in the classroom or leaving the classroom without permission (Docket No. 8, Exhibit 3, pp. 12-13 of 24).

### III. MEDICAL EVIDENCE.

  Plaintiff was delivered by Caesarean section at the University Hospitals of Cleveland (UHC) on July 12, 2003. Because of prolonged labor and fetal distress, the attending physician induced labor (Docket No. 8, Exhibit 11, pp. 3-16 of 24; Exhibit 12, pp. 5-13 of 21). Plaintiff had multiple risk factors for sepsis or a blood infection, yet, she was asymptomatic. Testing of Plaintiff's hearing by brainstem evoked a response which indicated normal results. At the time of discharge from the hospital, Plaintiff's general condition was considered normal (Docket No. 8, Exhibit 11, pp. 12, 18 of 24; Exhibit 12, pp. 20-21 of 21; www.ncbi.nlm.nih.gov).

  During the following month, Plaintiff was treated for general "sickness" which included symptoms of sneezing, coughing and constipation (Docket No. 8, Exhibit 10, pp. 2-4 of 16). Plaintiff was diagnosed with and treated for a viral infection, constipation and seborrhea/eczema (Docket No. 8, Exhibit 10, p. 6 of 16).

  On January 18, 2004, Plaintiff presented to the emergency room and complained of elevated body

temperature (Docket No. 8, Exhibit 10, p. 8 of 16).  Blood and urine cultures were extracted.  No bacterial growth was detected in the urine.  Ultimately, Plaintiff was treated with Motrin.  Her mother was instructed to offer plenty of fluids (Docket No. 8, Exhibit 10, pp. 12, 14-15 of 16).

Robin N. Stern, an audiologist, conducted an audiological examination on March 31, 2004.  No ear infections were present.  However, the results from the tympanogram, an objective measure of middle ear effusion or eustachian tube dysfunction, showed dysfunction with the tympanic membrane (Docket No. 8, Exhibit 13, p. 12 of 19).

On July 13, 2004, Plaintiff was treated for conjunctivitis and an insect bite.  Topical antibiotics were administered with instructions to follow up with a pediatrician in one to two days (Docket No. 8, Exhibit 13, pp. 2, 8 of 19).

Dr. Brian Berman, M. D., ordered an audiological evaluation on August 18, 2004.  Ms. Stern opined that the tympanometry results were consistent with negative pressure in the right ear and normal middle ear function in the left ear (Docket No. 8, Exhibit 13, p. 14 of 19).  Plaintiff's speech pattern awareness thresholds were at normal levels, her responses to warble tones were minimal and her speech was within normal limits bilaterally (Docket No. 8, Exhibit 13, p. 15 of 19).  Ms. Stern concluded that Plaintiff's audiological impairments were not a barrier to her readiness or ability to learn (Docket No. 8, Exhibit 13, p. 17-18 of 19).

On March 31, 2005, Ms. Stern conducted a follow-up audiogram for comparison to the August 18, 2004 results.  The tympanometry was consistent with a middle ear dysfunction bilaterally.  Plaintiff had normal hearing sensitivity in each ear.  However, she gave minimal responses to tones at normal levels.  Her speech awareness levels were in good agreement with the tones (Docket No. 8, Exhibit 13, p. 11 of 19).

Dr. Amy Heneghan, M. D., a pediatrician, treated Plaintiff on May 26, 2005, for an ear infection and upper respiratory infection (Docket No. 8, Exhibit 14, p. 2 of 21).

On May 16, 2005, Plaintiff presented to the emergency room at UHC with complaints of a fever. The attending physician intervened with a dosage of Motrin (Docket No. 8, Exhibit 14, p. 6 of 21).

On July 15, 2005, Dr. Dawn Turek conducted a well baby visit. Although Plaintiff apparently was fighting throughout the examination, Dr. Turek noted that Plaintiff could scribble, jump in place, follows directions, could use a cup and spoon. Dr. Turek concluded that she was a "well-appearing 24 month" child who ate well, slept all night and eliminated waste regularly (Docket No. 8, Exhibit 13, p. 10 of 19).

Dr. Jung K. Lee, Ph. D., conducted a clinical interview on September 6, 2005 when Plaintiff was twenty-six months of age. Diagnosing Plaintiff with attention deficit/hyperactivity disorder, combined type, Dr. Lee noted that Plaintiff's GAF showed moderate impairments in adaptive functioning and serious difficulty in behavior and social skills. Dr. Lee found that Plaintiff's attention span was "rather short," that her response speed was average but uneven, she was alert and cooperative during the evaluation yet she appeared to be fidgety, restless, disruptive and disobedient with a lack of behavioral control and social skills. She was talkative but she had difficulty sitting still. Her speech was mostly clear and intelligible and she had no difficulty understanding oral directions. Dr. Lee further observed that Plaintiff could verbally communicate with others and she had no difficulty in running, jumping or manipulating objects. She could appropriately copy vertical lines and almost circles. Her gross and fine motor skills were age appropriate but her tolerance for frustration and pressure was poor. Overall she lacked behavioral control, social skills, or an uncompromised ability to pay attention and concentrate (Docket No. 8, Exhibit 14, p. 13 of 21).

Dr. Tonnie A. Hoyle, Psy. D., completed a childhood disability evaluation form on October 18,

2005. She confirmed Dr. Lee's diagnosis of attention deficit/hyperactivity disorder, combined type and its severity. It was her opinion that Plaintiff's mental impairment was not of the severity to be medically or functionally equal to the listings (Docket No. 8, Exhibit 14, pp. 16-21 of 21).

On December 21, 2005, Dr. Turek noted that Plaintiff had diffuse flakiness of the scalp and her hair was thinning. The culture of Plaintiff's scalp revealed a species of fungus for which antifungal medication was prescribed (Docket No. 8, Exhibit 15, pp. 24, 26 of 27).

On January 24, 2006, Dr. Douglas Pawlarczyk noted that there was no evidence that Plaintiff's condition had worsened (Docket No. 8, Exhibit 14, p. 15 of 21).

In September 2006, Plaintiff was treated for persistent vomiting (Docket No. 8, Exhibit 15, p. 20 of 27).

In November 2006, Plaintiff was treated for a condition of the scalp that resulted in diffuse alopecia. This condition, too, was treated with an antifungal drug that was administered orally (Docket No. 8, Exhibit 15, pp. 15-16 of 27).

On November 10, 2006, Plaintiff was treated for an upper respiratory infection (Docket No. 8, Exhibit 15, p. 18 of 27).

Under Dr. Turek's supervision, a nurse practitioner addressed the course of treatment for the small spot in the back of Plaintiff's scalp on January 12, 2007. An antifungal medication was prescribed (Docket No. 8, Exhibit 15, pp. 15-16 of 27).

Dr. Jane E. Holan, M. D., a developmental pediatric specialist, conducted a physical examination on May 14, 2007. Dr. Holan observed that Plaintiff was an alert, active girl who spoke well overall, mostly intelligible to unknown observers. Overall Plaintiff was cooperative with the examination. It was Dr. Holan's opinion that Plaintiff had mild behavioral concerns that might be typical for her age and

therefore did not fall into full oppositional defiant or attention deficit hyperactive disorder. To assist Plaintiff's parents, Dr. Holan made some recommendations that infused communal resources with medical care to obtain optimal behavior management. Specifically, Dr. Holan prescribed a speech evaluation, a preschool evaluation through the Cleveland Public Schools and a mental health evaluation (Docket No. 8, Exhibit 15, pp. 10-11 of 27).

Plaintiff's well baby visits on September 12 and October 1, 2007 showed nothing of concern to the attending physician (Docket No. 8, Exhibit 15, pp. 5-6 of 27). To rule out anemia, a complete blood count was performed on October 1, 2007. The results showed that the hematocrit and hemoglobin levels were within a normal range (Docket No. 8, Exhibit 15, p. 7 of 27).

On March 13, 2008, Dr. Turek oversaw a physical examination in contemplation of dental surgery. Plaintiff was scheduled to undergo filling replacement. There was no fever or upper respiratory infection symptoms (Docket No. 8, Exhibit 15, p. 4 of 27).

## IV. THE ALJ'S FINDINGS.

Upon consideration of the evidence, the ALJ made the following findings:

1. Plaintiff was born on July 12, 2003. Therefore, she was an older infant on June 22, 2005, the date the application was filed, and was at the time of hearing, a preschooler.
2. Plaintiff had not engaged in substantial gainful activity at any time relevant to this decision.
3. Plaintiff had the following severe impairment: attention deficit hyperactivity disorder.
4. Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1.
5. Plaintiff had not been disabled, as defined in the Act, since June 22, 2005, the date the application was filed.

(Docket No. 8, Exhibit 2, pp. 15-16 of 23).

## V. STANDARD OF DISABILITY

An individual under the age of 18 shall be considered disabled for purposes of this title if that

individual has a medically determinable physical or mental impairment which results in marked and severe functional limitations, and which can be expected to result in death, or which has lasted, or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i) (Thomson Reuters/West 2011). A three-step sequential evaluation process is employed to determine whether an individual under 18 is disabled. 20 C. F. R. § 416.924 (Thomson Reuters 2011). Specifically, the SSA will consider (1) whether the child is engaged in substantial gainful activity; (2) whether the child has a medically determinable severe impairment which is expected to result in death, has lasted or is expected to last for a continuous period of not less than 12 months and, if so, (3) whether the impairment or combination of impairments meets, medically equals, or functionally equals the severity of any impairment listed in the listing found at 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 416.924 (a), (b), (c), (d) (Thomson Reuters/West 2011).

      The SSA will find an impairment functionally equivalent to a Listing if the child has an extreme limitation in one area of functioning, or a marked limitation in two areas of functioning. 20 C.F.R. § 416.926a(b)(2) (Thomson Reuters/West 2011). If the child has a severe impairment or combination of impairments that does not meet or medically equal any listing, SSA will decide whether it results in limitations that functionally equal the listings. 20 C. F. R. § 416.926a (a) (Thomson Reuters 2011). By "functionally equal the listings," SSA means that your impairment(s) must be of listing-level severity; i.e., it must result in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain, as explained in this section. 20 C. F. R. § 416.926a (Thomson Reuters 2011). An assessment of the functional limitations caused by the child's impairments will be made, for example, what the child cannot do, what the child has difficulty doing or needs help doing, or are restricted from doing because of his or her impairment(s). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2011). When making a finding

9

regarding functional equivalence, SSA will assess the interactive and cumulative effects of all of the impairments for which there is evidence, including any impairments the child has that are not "severe." (*See* § 416.924(c)). 20 C. F. R. § 416.926a(a) (Thomson Reuters 2011). Assessing functional limitations, SSA will consider all the relevant factors in §§ 416.924a, 416.924b, and 416.929 including, but not limited to:

(1) How well the child can initiate and sustain activities, how much extra help the child needs, and the effects of structured or supportive settings (*see* § 416.924a(b)(5).
(2) How the child functions in school (*see* § 416.924a(b)(7); and
(3) The effects of your medications or other treatment (*see* § 416.924a(b)(9).

SSA will look at the information in the child's case record about how his or her functioning is affected during performance of all activities when deciding whether the impairment or combination of impairments functionally equals the listings. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). The child's activities are everything done at home, at school, and in the community. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). SSA will consider how the child appropriately, effectively, and independently perform activities compared to the performance of other children his or her age who do not have impairments. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). Consideration will be given to how the child functions in activities in terms of six domains. 20 C. F. R. § 416.926a(b) (Thomson Reuters 2011). The domains are:

(i) Acquiring and using information;
(ii) Attending and completing tasks;
(iii) Interacting and relating with others;
(iv) Moving about and manipulating objects;
(v) Caring for yourself; and,
(vi) Health and physical well-being.

20 C. F. R. § 416.926a(b) (1) (i), (ii), (iii), (iv), (vi) (Thomson Reuters 2011).

When assessing whether the child can function in each domain, SSA will ask for and consider

information that will help answer the following questions about whether the child's impairment(s) affects the child's functioning and whether the activities are typical of other similarly aged children who do not have impairments.

    (i)      What activities are you able to perform?
    (ii)     What activities are you not able to perform?
    (iii)    Which of your activities are limited or restricted compared to other children your age who do not have impairments?
    (iv)    Where do you have difficulty with your activities-at home, in childcare, at school, or in the community?
    (v)     Do you have difficulty independently initiating, sustaining, or completing activities?
    (vi)    What kind of help do you need to do your activities, how much help do you need, and how often do you need it?

20 C. F. R. § 416.926a(b)(2)(i), (ii), (iii), (v), (vi) (Thomson Reuters 2011).

SSA will decide that a child's impairment(s) functionally equals the listings if the impairment is of listing-level severity. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2011). The child's impairment(s) is of listing-level severity if he or she has "marked" limitations in two of the domains in paragraph (b)(1) of this section, or an "extreme" limitation in one domain. 20 C. F. R. § 416.926a(d) (Thomson Reuters 2011). The term "marked" means a limitation in a domain when the child's impairment(s) interferes seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011). The child's day-to-day functioning may be seriously limited when his or her impairment(s) limits only one activity or when the interactive and cumulative effects of the child's impairment(s) limit several activities. 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011). "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." 20 C. F. R. § 416.926a(e) (2)(i) (Thomson Reuters 2011).

"Extreme" limitation means a limitation that is "more than marked." 20 C. F. R. § 416.926a(e)(2)(i) (Thomson Reuters 2011). It does not necessarily mean a total lack or loss of ability to

function. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2011). SSA will find that the child has an "extreme" limitation in a domain when his or her impairment(s) interferes very seriously with his or her ability to independently initiate, sustain, or complete activities. 20 C. F. R. § 416.926a(e) (3)(i) (Thomson Reuters 2011). The day-to-day functioning may be very seriously limited when the child's impairment(s) limits only one activity or when the interactive and cumulative effects of his or her impairment(s) limit several activities. 20 C. F. R. § 416.926a(e)(3)(i) (Thomson Reuters 2011).

## VI. STANDARD OF REVIEW.

Under 42 U.S.C. § 405(g), a district court is permitted to conduct judicial review over the final decision of the Commissioner. *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006). Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree

with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security,* 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VII. DISCUSSION.

Plaintiff argues that:

(1) Substantial evidence shows that she meets 112.11 of the Listing.
(2) The ALJ erred in failing to properly consider her GAF score provided by Dr. Lee.
(3) The ALJ failed to properly assess the subjective complaints in his decision.

Defendant contends that substantial evidence supports the ALJ's finding that Plaintiff's impairment does not functionally equal Listing 112.11.

**A.  112.11 OF THE LISTING.**

To demonstrate the presence of an attention deficit hyperactivity disorder, the claimant must present medical evidence manifesting developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.11 (Thomson Reuters 2011). An impairment meets the severity of this disorder when the requirements of A and B are satisfied. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.11 (Thomson Reuters 2011). Under the requirements of A and B medically documented findings of marked inattention, marked impulsiveness and marked

13

hyperactivity must coexist and result in at least two of the following:

   a.   Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age six, by appropriate tests of language and communication; or
   b.   Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or
   c.   Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or
   d.   Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 112.11 & 112.02(B)(2) (Thomson Reuters 2011).

Here, there was no medical evidence of medical evaluations or treatment from which the ALJ could find that Plaintiff's problems placed her at risk for marked inattention, marked impulsiveness, marked hyperactivity and marked impairments in concentration and persistence. Dr. Lee, a consultant, labeled Plaintiff with attention deficit hyperactivity disorder. He did consider her inattentive, hyperactive and impulsive. However, he did not find manifestation of developmentally inappropriate degrees of inattention, impulsiveness, and hyperactivity.

Dr. Holan adopted the opinion that Plaintiff had some difficulties with hyperactivity and provided Plaintiffs' parents with a mechanism to address the symptoms. She, too, did not document that Plaintiff suffered from marked inattention, marked impulsiveness, marked hyperactivity and marked impairments in concentration and persistence.

Dr. Turek acknowledged that Plaintiff had mild behavioral problems that were typical for her age. Dr. Turek's records, when reviewed in their entirety, also do not show medically documented evidence

that Plaintiff had more than moderate limitations with inattention, impulsiveness and/or hyperactivity.

The Magistrate need not assess whether Plaintiff could meet part B of 112.11 of the Listing as Plaintiff could not make a prima facie case for compliance with part A of 112. 11 of the Listing. The Commissioner's decision must be affirmed as the ALJ applied the correct legal standards and made findings of fact regarding Plaintiff's inability to meet the criteria based on substantial evidence in the record.

**B.**     **THE GAF SCORE**.

The GAF score is "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning." *Stewart v. Commissioner of Social Security Administration*, 2011 WL 1113404, *3 (N. D. Ohio 2011) (*citing DeBoard v. Commissioner of Social Security*, 211 Fed. Appx. 411, 415 (6th Cir. 2006) (*quoting Wesley v. Commissioner of Social Security*, 2000 WL 191664, at *13–*14 (6th Cir. 2006)) (internal quotation marks omitted)). It considers the non-medical factors which do not constitute work-related functional limitations, and therefore do not necessarily translate into functional limitations for the purpose of assessing Social Security disability. *Id.* (*citing Hall v. Astrue*, 1:10–cv–0160, 2010 U.S. Dist. LEXIS 134247 at *20, 2010 WL 5128335 (E. D. Cal. 2010) (quotation marks omitted). Thus, "[w]hile a GAF score may be of considerable help to the ALJ [in making a decision], it is not essential to the [decision's] accuracy." *Id.* (*citing Howard v. Commissioner of Social Security*, 276 F.3d 235, 241 (6th Cir. 2002) (determining that the ALJ's failure to reference a GAF score in the decision, by itself, is not a sufficient ground to reverse the decision). Indeed, the Sixth Circuit has recognized that the Commissioner "has declined to endorse the [Global Assessment Functioning] score for use in the Social Security and [Supplemental Security Income] disability programs, and has indicated that [Global Assessment Functioning] scores have no direct correlation to the severity requirements of the

mental disorder listings." *Id.* (*citing Deboard*, *supra*, 211 Fed. Appx. at 415).

Although it was not necessary that the ALJ reference Plaintiff's GAF score in his decision, the evidence shows that the ALJ did not ignore Plaintiff's GAF score. The ALJ considered Dr. Lee's GAF score in assessing the severity of Plaintiff's behavioral difficulties (Docket No. 8, Exhibit 2, p. 17 of 23).

**C.     SUBJECTIVE COMPLAINTS.**

Plaintiff contends that the ALJ failed to accord substantial weight to the subjective complaints of Plaintiff's parents about her inability to cooperate with others, comply with the rules, respond to criticism and respect and care for the possessions of others.

Pursuant to 20 C.F.R. § 416.913(d)(4), a claimant is entitled to present evidence from non-medical sources such as parents in an effort to show the severity of the claimant's impairment and how it affects the claimant's ability to work. The Sixth Circuit Court of Appeals has determined that with regard to witness testimony, the ALJ must consider the testimony of friends and family members. *Witte v. Astrue*, 2009 WL 2983057, 10 (S. D. Ohio 2009) (*citing* Durham v. Commissioner of Social Security, 133 Soc. Sec. Rep. Serv. 436 (6th Cir. 2008) (*citing Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). Therefore, "[l]ay testimony as to a claimant's symptoms is competent evidence which the Secretary must take into account, *Id.* (*citing* Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993)), unless he expressly determines to disregard such testimony, in which case 'he must give reasons that are germane to each witness.' " *Id.* (*citing Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996)). An ALJ's failure to expressly set forth reasons discounting lay witness testimony is erroneous. *Id.*

With regard to the testimony provided by Plaintiff's parents, all indications are that the ALJ considered their testimony and did not discount it when considering Plaintiff's functions in activities in terms of the six domains. As to domain one, Plaintiff's father testified that Plaintiff did not have difficulty

16

acquiring information, she simply manipulated her response to it and failed to follow the rules. Plaintiff understood verbal commands but she generally opted to ignore them (Docket No. 8, Exhibit 3, p. 17 of 24). The ALJ's finding that Plaintiff had no limitation with acquiring and using information is consistent with her father's testimony.

As to domain two, the ALJ found that Plaintiff was unable to focus and she became frustrated if she did not understand a task. Both parents addressed Plaintiff's reaction when given a task. Neither parents addressed the extent of her comprehension when given a task.

With respect to domain three, the ALJ found that Plaintiff had problems interacting with other classmates and family members. Plaintiff's parents confirmed this fact. Her mother testified that Plaintiff was unable to cooperate with others. She could not play with her niece without confrontation and at school she fought with her classmates (Docket No. 8, Exhibit 3, pp. 11, 13 of 24). Plaintiff's father testified that at school, there was a "lot of biting" and a "lot of hitting" (Docket No. 8, Exhibit 3, p. 14 of 24). Plaintiff's parents complained that when Plaintiff was criticized, her reaction was to throw a temper tantrum. Clearly, the ALJ embraced the testimony of Plaintiff's parents in assessing domain three.

At domain four, the ALJ found that since the age of eighteen months, Plaintiff has been able to move her body and manipulate objects. Her parents' testimony is consistent with this finding. She exhibited her disrespect and lack of concern for the property of others through physical manipulation. Her parents testified that she tore her bedroom comforter, she was able to stomp her feet, fight her fellow classmates, break her toys, open doors, play with her Play Station 2 and get snacks when it suited her needs (Docket No. 8, Exhibit 3, pp. 14-17). There is no indication from her parents of her limitations in the ability to ambulate or manipulate.

When addressing domain four, the ALJ found that Plaintiff could care for herself. Plaintiff's

17

parents did not testify regarding any limitation in dressing or otherwise caring for herself.

Finally, with respect to domain five, Plaintiff's parents offered nothing by way of complaints of Plaintiff's physical health.

In conclusion, the ALJ did consider Plaintiff's parents' testimony credible and to the extent that it was relevant, he incorporated their testimony in assessing the domains. There is no indication that the ALJ discounted such testimony. Thus, the ALJ was not required to set forth reasons for discounting lay witness testimony.

## VIII. CONCLUSION

For the foregoing reasons, the Commissioner's decision is affirmed.

**IT IS SO ORDERED.**

/s/ Vernelis K. Armstrong
United States Magistrate Judge

Date: July 25, 2011